UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No. 3:16-CR-070 JD |
| | ) | |
| D'SHAWN JEANES | ) | |

REPORT AND RECOMMENDATION

I. Introduction

Defendant, D'Shawn Jeanes ("Jeanes"), is charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). Jeanes has moved to suppress all evidence obtained as a result of the detention and the search of the vehicle he was driving on April 28, 2016, on the grounds that the stop of vehicle lacked reasonable suspicion and the evidence seized from his vehicle was seized in violation of the Fourth Amendment. In his motion, Jeanes claims that his seizure was based on an uncorroborated, anonymous tip which, under the circumstances, was insufficient to justify the stop or the seizure.

The defendant's Motion to Suppress [DE 22] is before the undersigned Magistrate Judge, having been referred by an Order [DE 25] of the District Court for a Report and Recommendation pursuant to 28 U.S.C. §§ 636(b)(1)(B), Fed. R. Crim. P. 59(b)(1), and N.D. Ind. L.R. 72-1. I held an evidentiary hearing on the defendant's motion to suppress on October 20, 2016. At the hearing, Detective Marty Corley ("Detective Corley" or "Corley") of the Michigan City Police Department, testified, and the parties introduced the recordings of the relevant police radio traffic and the 911 call. (Gov. Hrg. Ex. 1 & 2).

At the conclusion of the hearing, I took the instant motion under advisement. For the reasons stated herein, I RECOMMEND the defendant's motion to suppress be DENIED.

## II. Relevant Facts and Inferences

In making the following findings of fact, I have considered the briefs of the parties, the evidence presented, and the credibility of the witnesses. The evidence in the file and admitted at the hearing established the facts as outlined below:

On April 28, 2016, an anonymous caller contacted the Michigan City 911 dispatch center regarding a person in a car who was waving a gun. As noted above, at the hearing on October 20, 2016, the Government introduced and played the 911 recording of an anonymous caller's report to the Michigan City Police Department dispatch center (Gov. Hrg. Ex. 1), as well as a recording of the relevant police radio traffic. (Gov. Hrg. Ex. 2).

The 911 recording includes the statements of the unknown caller and the dispatch operators. (Gov. Hrg. Ex. 1). The anonymous caller provided "play-by-play" eyewitness commentary as she was following the subject vehicle. Id. During her running commentary, the anonymous caller indicated that a black male in a black Suburban vehicle was waving a gun "out" [of the vehicle]. Id. The caller said she was following the vehicle traveling east on 9th Street approaching the intersection with Wabash. Id. The caller also indicated that she was "scared" by the actions of the person in the vehicle. Id. She said that the person was yelling out "slurs and stuff,"[1] but that no shots had been fired. Id. She continued to update the dispatch center on the whereabouts of the vehicle as it approached Kline Avenue. Id. At one point, the caller indicated that she could not determine if the person was still waving the gun because she was too far behind the subject vehicle. Id. When asked by the dispatch operator to identify the type of vehicle she

---

[1] There was some dispute at the hearing between the parties about the statement made by the anonymous caller. The Government believed the caller stated that the word used by the caller was "swerves" but Defense counsel disagreed. Initially, having listened to the tape at the hearing, I believed that the caller had used the word "swerves." (Hrg. Tr., p. 23, ln. 8., to p. 24, ln. 9). After listening carefully to the 911 recording, however, I am convinced that the word used by the caller is "slurs." I reached this conclusion not only based on listening carefully to the recording but also based on the context in which the word was used by the caller.

was driving, the caller reported that she was driving a grey Trans Am automobile. Id. She then told the dispatch operator that she had lost sight of the subject vehicle, but then advised "I think the police officer has got him now." Id. When the caller was asked by the dispatcher to identify herself, she stated that she does not "want to be in this."[2] Id. The caller then thanked the dispatcher and hung up. Id. The call lasted for a period of approximately three minutes, and ended soon after the caller confirmed that the police had stopped the subject vehicle. Id.

Detective Corley testified to the following: He has served as a police officer for sixteen years, and for approximately ten years has worked in various investigative divisions. (Hrg. Tr., p. 7, ln. 2–7). On the afternoon of April 28, 2016, he was working an off-duty security job while wearing his tactical uniform marked "Police" on the front and back and with his department-issued badge, radio, handcuffs, TASER, and firearm. (Id. at p. 8, ln. 8–11). He was also driving a Ford Fusion outfitted with lights and sirens. (Id. at p. 8, ln. 15–16). He was in the vicinity of Ripley and Wabash Streets in Michigan City when he heard the dispatch about a person in a black SUV Suburban with a handgun. (Id. at p. 7, ln. 16–19). This location is near 9th and Wabash Streets. (Id. at p. 8, ln. 17–18). The dispatch stated that the subject vehicle was eastbound on 9th Street. (Id. at p. 7, ln. 24–25). Detective Corley proceeded northbound on Wabash until he reached 11th Street.[3] (Id. at p. 7, ln. 20–21). He proceeded on eastbound on 11th Street (which runs parallel to 9th Street). (Id. at p. 8, ln. 1–2). As he turned from 11th Street

---

[2] Considering the fact that the caller followed the suspect vehicle for several minutes to assist the police in identifying the suspects and that she only ended her call after the suspect vehicle had been stopped by the police, it is reasonable to infer that the caller did not wish to additionally involve herself in the situation and did not see a need for her further involvement.

[3] During this timeframe, the police radio traffic also reported that a firearm had been thrown from the vehicle. (Gov. Hrg. Ex. 2; Hrg. Tr., p.19, ln. 8–9). At the hearing, Detective Corley stated that he was not aware of this report at the time that he made the traffic stop. (Id. at p. 19, ln. 10, to p. 21, ln. 1). As such, I did not consider the information about a gun being thrown from the vehicle as relevant to either support or eliminate Corley's reasonable suspicion to stop Jeanes' vehicle.

onto Pine Street, Detective Corley observed a black Suburban that had turned onto Pine Street from 10th Street and pointing northbound on Pine Street. (Id. at p. 9, ln. 23–25). This location was approximately 3 blocks from the intersection of 9th Street and Wabash that was where the vehicle was observed by the anonymous caller. (Id. at p. 10, ln. 5). The vehicle had pulled over to the side of the street and was parked as Detective Corley approached. (Id. at p. 10, ln. 8–10). At that juncture, recognizing that the vehicle was similar to the description provided by dispatch, Detective Corley activated his lights and siren, and stopped the Suburban. (Id. at p. 10, ln. 12–13). He then observed that the black Suburban had a temporary tag rather than a permanent plate. Corley reported the description of the vehicle, his location, and the number on the temporary tag. (Id. at p. 12, ln. 1–3). At approximately 1:53 P.M., Corley reported to dispatch that, "I'm out with a black Suburban."[4] (Id. at p. 9, ln. 17–20).

Immediately thereafter, Corley exited his vehicle and approached the driver's side of the black Suburban. (Id. at p. 12, ln. 10–11). Once he arrived at the driver's side, he recognized and identified the driver as D'Shawn Jeanes and the passenger as Duane Simmons. (Id. at p. 12, ln. 13–15). Both the driver and the passenger were advised to keep their hands visible. (Id. at p. 12, ln. 16–17). Corley advised Mr. Jeanes that the police had received a call about a black SUV being driven by a black male with a gun being waved around, and asked Jeanes to consent to a search of the vehicle.[5] (Id. at p.12, ln. 22–23). Jeanes gave his consent to search the vehicle. (Id. at p. 13, ln. 7).

By this time, Officer Teska of the Michigan City Police had arrived on scene. (Id. at p.

---

[4] In comparing the time lines of the police radio traffic and the 911 call, Corley's transmission that "I'm out with a black Suburban" is near in time to the statement made by the unknown caller that "I think the police officer has got him now." (Hrg. Tr., p. 11, ln. 15–19).

[5] During the 911 call, the unidentified caller never stated that the driver was waving the gun; rather, the caller said a man in black Suburban was waving a gun. (Gov. Hrg. Ex. 1).

4

13, ln. 9). Corley had the occupants exit the vehicle, and Corley focused on Jeanes while Teska focused on Simmons. (Id. at p. 13, ln. 8–10). Corley patted down Jeanes outer clothing, and directed him to the back of the vehicle. (Id. at p. 13, ln. 10–11). At this juncture, Jeanes revealed that a gun was underneath the seat. (Id. at p. 13, ln. 13).

After Corley has learned about the gun, Lieutenant Ramion transmitted over the radio, and asked, "Hey, do you have the right vehicle because I've got another black Suburban out here?" (Id. at p. 13, ln. 16–17, 22–23). Corley responded by saying, "Yes, we've got the vehicle." (Id. at p. 13, ln. 20–21). Corley based that statement on his knowledge that Jeanes had admitted there was a weapon was under the seat. (Id. at p. 13, ln. 24–25; p. 14, ln. 1).

Corley also knew, based on his extensive personal and professional contacts with Jeanes,[6] Jeanes did not have a left hand. (Id. at p. 18, ln. 12–23). As such, Corley knew that it would be difficult, if not impossible, for Jeanes to wave a firearm with his left hand or to hold anything in his left hand. (Id. at p. 18, ln. 24–25; p. 19, ln. 1–9).

Jeanes was arrested as the result of the incident. In due course, Jeanes was indicted for violating of 18 U.S.C. § 922(g)(1) ("felon in possession"). [DE 1].

During the hearing, I found that the statements made by the unknown eyewitness caller were sincere, and were made contemporaneously with events that were observed by Detective Corley. Based on the fact that the unknown eyewitness continued to provide contemporaneous information to the police in an effort to assist in the apprehension of the individual who was waving the gun, it is fair to conclude that she was motivated by performing her civic duty to

---

[6] Corley testified that he has known D'Shawn Jeanes since he became a police officer, maybe even earlier. He has known Jeanes because they are both from Michigan City, and he been a mentor to Jeanes' sons. Corley concluded by saying "I guess I've known him throughout my police career and then also known him outside of my police career." (Hrg. Tr. at p. 18, ln. 6–11).

assist law enforcement. Furthermore, as the statements of unknown caller sounded sincere and were corroborated by other evidence, I found that they were credible and reliable.

I also found Detective Corley's testimony to be coherent, comprehensive, and credible, and corroborated by the 911 Dispatch and radio traffic recordings. (Gov. Hrg. Ex. 1 & 2). I found Detective Corley to be credible based on his demeanor while testifying, the foundations he had for testifying to certain facts, and the consistency of his testimony with other evidence in the case.

### III. Analysis and Conclusions

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. If a search is conducted without a warrant, the Government bears the burden of proving by a preponderance of the evidence that an exception to the warrant requirement existed at the time of the search. *United States v. Taylor*, 776 F.3d 513, 518 (7th Cir. 2015).

support insistence

While it is a considerable understatement to observe that the invention and widespread proliferation of the automobile has created significant challenges for courts in applying principles of constitutional jurisprudence, it has also been generally recognized that when the police stop a vehicle and detain the occupants, the stop is a seizure of the occupants within the meaning of the Fourth Amendment. *See, e.g.*, *Whren v. United States,* 517 U.S. 806, 809-10 (1996); *Brendlin v. California,* 551 U.S. 249, 255–59 (2007). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation

has occurred." *Whren,* 571 U.S. at 810.⁷ Any ulterior motive a law enforcement officer may have for effectuating the stop is irrelevant. *Id.* at 813; *United States v. Bass,* 325 F.3d 847, 850 (7th Cir. 2003).⁸

"A traffic stop is similar to an investigative detention and is thus governed by the principles set forth in *Terry v. Ohio,* 392 U.S. 1 . . . (1968)." *United States v. Finke,* 85 F.3d 1275, 1278 (7th Cir. 1996) (citing *Berkemer v. McCarty,* 468 U.S. 420, 439 (1984), *et al.*). Under *Terry*, police officers are justified in conducting a brief investigative stop if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21. To justify this type of warrantless seizure, police officers need only "reasonable suspicion"—that is, "a particularized and objective basis for suspecting the particular person stopped" of breaking the law. *Navarette v. California,* 572 U.S. ____, 134 S.Ct. 1683, 1687–88 (2014) (anonymous caller possessed eyewitness knowledge of dangerous driving, which gave significant support to the reliability of the tip and provided police with reasonable suspicion of criminal activity).

While reasonable suspicion requires more than a mere "hunch," it does not need to rise to the level of suspicion required for probable cause. *United States v. Sokolow,* 490 U.S. 1, 7 (1989). The "reasonable suspicion" necessary to justify such a stop "is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White,* 496 U.S. 325, 330 (1990). In determining the reasonableness of a *Terry* stop, the facts are "judged against an objective standard: would the facts available to the officer at the moment of seizure or

---

⁷ *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996) (so long as the officer has probable cause to believe that a traffic violation has occurred, the resultant stop is not unlawful and does not violate the Fourth Amendment).

⁸ *United States v. Ferguson*, 8 F. 3d 385, 391 (6th Cir. 1993) (A traffic stop is reasonable if there is probable cause to believe a traffic violation occurred and what else the officer suspected about the driver is irrelevant).

the search 'warrant a man of reasonable caution in the belief' that the action takes was appropriate?" *United States v. Tilmon,* 19 F.3d 1221, 1224 (7th Cir. 1994) (quoting *Terry*, 392 U.S. at 21–22).

Consistent with *Terry*, a vehicular stop "must be justified at its inception and be reasonably related in scope to the circumstances which justified the interference in the first place." *Finke,* 85 F.3d at 1279 (quoting *Terry,* 392 U.S. at 19). "The detention must be 'temporary and last no longer than is necessary to effectuate the purpose of the stop.'" *Id.* (quoting *Florida v. Royer,* 460 U.S. 491, 500 (1983)). Moreover, the least intrusive means reasonably available to verify or dispel the officer's suspicions must be employed. *Id.*; *see also United States v. Teslim,* 869 F.2d 316, 322 (7th Cir. 1989). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'— to address the traffic violation that warranted the stop." *Rodriguez v. United States,* ___ U.S. ___, 135 S.Ct. 1609, 1614 (2015) (citing *Illinois v. Caballes,* 543 U.S. 405, 407 (2005)). Authority for the seizure ends when the tasks tied to the traffic infraction are—or reasonably should have been—completed. *Id.* (quoting *Royer,* 460 U.S. at 500). In determining the reasonable duration of a stop, it is appropriate to examine whether the police diligently pursued the investigation. *Id.* (quoting *United States v. Sharpe,* 470 U.S. 675, 686 (1985).

"[T]he ultimate touchstone of Fourth Amendment is 'reasonableness.'" *Rodriguez,* 135 S.Ct. at 1617 (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Reasonableness is defined "in objective terms by examining the totality of the circumstances," *id.* (quoting *Ohio v. Robinette* 519 U.S. 33, 39 (1996)), and by considering "the traditional protections against unreasonable searches and seizures afforded by the common law at the time of framing. *Id.* (citing *Atwater v. Lago Vista,* 532 U.S. 318, 326 (2001)). The reasonableness of seizures that

8

are less intrusive than a traditional arrest [*e.g.*, *Terry* stop], depends " 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' " *Brown v. Texas*, 443 U.S. 47, 50–51(1979) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977)). Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. *See, e. g.*, *United States v. Brignoni-Ponce,* 422 U.S. 873, 878–83 (1975).

Furthermore, to be reasonable is not to be perfect, and so the legal interpretation of the Fourth Amendment has allowed for some mistakes on the part of government officials, giving them "fair leeway for enforcing the law in the community's protection." *Brinegar v. United States,* 338 U.S. 160, 176 (1949). In fact, the U.S. Supreme Court has recognized that searches and seizures based on both mistakes of fact and mistakes of law can be reasonable. *See, e.g.*, *Heien v. North Carolina,* 574 U.S. \_\_\_, 135 S.Ct. 530, 536 (2014) (as mistake of law was objectively reasonable, officer has reasonable suspicion justifying traffic stop).

Of course, this case requires an additional level of analysis because it involves a tip from an anonymous or unknown caller. It is well established that reasonable suspicion for an investigative stop may be based on information supplied by another person, and need not be based solely on a police officer's personal observation. *Adams v. Williams,* 407 U.S. 143, 147 (1972). However, "[a]nonymous tips…are generally less reliable than tips from known informants." *Florida v. J.L.,* 529 U.S. 266, 269 (2000). Typically, "an anonymous tip [standing] *alone* seldom demonstrates the informant's basis of knowledge or veracity." *White,* 496 U.S. at 329 (emphasis added). That is because "ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations," and an anonymous tipster's veracity is

9

"'by hypothesis largely unknown, and unknowable.'" *Id.* "[H]owever, there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *J.L.,* 529 U.S. at 270. "[An informant's] explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case." *Illinois v. Gates,* 462 U.S. 213, 234 (1983).

In *J.L.,* an anonymous caller reported that a young black male wearing a plaid shirt and standing at a particular bus stop was carrying a gun. 529 U.S. at 268. When two police officers arrived at the bus stop six minutes later, they observed three black males "just hanging out." *Id.* One of the black males was wearing a plaid shirt, but the police officers did not observe a firearm or any threatening, furtive, or unusual movement. *Id.* The United States Supreme Court held that "an anonymous tip lacking [sufficient] indicia of reliability . . . does not justify a stop and frisk wherever and however it alleges the illegal possession of a firearm. *Id.* at 274.

"Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, see *Adams v. Williams,* 407 U.S. 143, 146–47 . . . (1972), 'an anonymous tip seldom demonstrates the informant's basis of knowledge or veracity,' *Alabama v. White,* 496 U.S. [325,] 329 [1990] . . . ." *Id.* at 270. In *White*, the unknown informant accurately predicted the suspect's movements thereby allowing for the reasonable inference that the tipster had inside knowledge about the suspect, which enhanced the credibility of the tipster and created a sufficient indicia of reliability for the police to stop the suspect. *White,* 496 U.S. at 332. While the tipster in *White* had an indicia of reliability, the tipster in *J.L.* provided insufficient information for the police "to test the informant's knowledge or credibility." *J.L.,* 529 U.S. at 272. In these circumstances, reasonable suspicion requires that

"a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.*

The policy behind this rule is to afford the reviewing court with the ability to "judge the credibility of the informant" and to avoid an unacceptable "risk of fabrication." *Id.* at 275 (Kennedy, J., concurring). In his concurrence, Justice Kennedy noted, "[a]n instance where a tip might be considered anonymous but nevertheless sufficiently reliable to justify a proportionate police response may be when an unnamed person driving a car the police officer later describes stops for a moment and, face to face, informs the police that criminal activity is occurring." *Id.*; *see also United States v. Williams,* 731 F.3d 678 (7th Cir. 2013) (anonymous tip of 25 individuals acting loudly and displaying handguns); *United States v. Hicks,* 531 F.3d 555 (7th Cir. 2008) (anonymous tipster reported that man inside a house had a gun and was threatening to shoot a woman). Justice Kennedy noted that consideration of specific factual situations where an anonymous tip had an indicia of reliability to overcome the risk of fabrication would need to be left until another day. *J.L.*, 529 U.S. at 276.

In *Navarette v. California,* an anonymous tipster called 911 and reported that a Silver Ford 150 pickup truck, which was headed southbound on Highway 1, had just run her off the road. 134 S.Ct. at 1689. The caller also provided the license plate number. *Id.* Several minutes later, an officer spotted the truck several miles further down the road and pulled the truck over. *Id.* at 1686–87. In determining whether the stop was supported by reasonable suspicion, the U.S. Supreme Court considered case precedent, including *White* and *J.L.*, and found that the report contained sufficient indicia of reliability, and that the tip created a reasonable suspicion of drunk driving that supported the stop. *Id.* at 1690–92. The Court considered several factors in determining the anonymous tip contained sufficient indicia of reliability. *Id.* First, the Court

11

found that the caller's account of what had occurred was sufficiently reliable because she was claiming eyewitness knowledge that the truck was driven dangerously. *Id.* at 1689. Additionally, the police were able to corroborate the truth of some of what the caller reported—a truck meeting the description was found approximately 18 minutes after the report and located approximately 19 miles south of the mile marker indicated by the caller. *Id.* Moreover, the caller's report was substantially contemporaneous with the event of being run off the road, and that substantially contemporaneous reports "negate the likelihood of deliberate or conscious misrepresentation." *Id.* (citing Advisory Committee's Notes on Fed. Rule Evid. 803(1), 28 U.S.C.App., p. 371— describing rationale of the hearsay exception for present sense impressions). The Court further noted that a similar rationale for reliability applies to a "statement relating to a startling event." *Id.* (citing Fed. Rule Evid 803(2)—hearsay exception for excited utterances). The Court also considered the caller's use of the 911 emergency system as an additional indicator of veracity because the system makes calls traceable and would potentially subject the caller to prosecution for making a false report under state law. *Id.* at 1689–90; *see also United States v. Drake,* 456 F.3d 771, 775 (7th Cir. 2006) (an emergency 911 call is entitled to greater reliability than an anonymous tip concerning general criminality). Finally, in considering the totality of circumstances, the Court determined that the anonymous caller's report provided police with reasonable suspicion that the driver of the truck was engaged in ongoing criminal activity; namely, that the driver exhibited behaviors commonly associated with drunk driving. *Id.* at 1689.

Interestingly, the facts here are remarkably similar to the facts in *United States v. Drake,* 456 F.3d 771. In *Drake*, the Fort Wayne Police Department 911 dispatch center received a report of an ongoing emergency; namely, two groups of men were involved in a public disturbance and each group had a gun. *Id.* at 772–73. Only minutes passed from the time the 911 operator relayed

the description of the suspects until the time the suspects were stopped by police. *Id.* In fact, like this case, the caller in *Drake* told the 911 operator that she could see the police arriving on the scene. *Id.* at 774. The *Drake* court found that the caller was of untested reliability, the police were justified in relying on the caller's contemporaneous eyewitness report of an emergency situation and the eyewitness report to the 911 center provided police with the necessary collective knowledge to establish reasonable suspicion of ongoing criminality. *Id.* The singular distinction between the facts of *Drake* and this case is that the caller in Drake identified herself near the end of the 911 call whereas here, the caller declined to identify herself. *Compare Id.* at 774–75, *with* Gov. Hrg. Ex. 1. As noted by the *Drake* court, "[w]e therefore presume the reliability of an eyewitness 911 call reporting an emergency situation for purposes of establishing reasonable suspicion, *particularly when the caller identifies herself. Id.* at 775 (emphasis added). In *Drake,* the 911 call reported an immediate threat to public safety and the caller provided sufficient details to allow the police to identify the suspects. *Id.* Here, the anonymous caller provided police with a contemporaneous eyewitness report of an emergent situation; namely waving a gun outside a vehicle near downtown Michigan City. Gov. Hrg. Ex. 1. The police responded within minutes and located the suspect vehicle, and the anonymous caller confirmed to the 911 operator that the police had pulled over the suspects. *Id.* On balance, this eyewitness report—albeit anonymous—is the type of report that the *Drake* court found to be inherently reliable in establishing reasonable suspicion for the police to make a Terry stop. *Drake,* 456 F.3d at 774–76. The fact that the caller in this case failed to identify herself does not significantly undermine the reliability of her tip, especially when she provided a contemporaneous eyewitness account of the ongoing emergency situation to the 911 center, which was easily corroborated by the police within a few minutes.

Before applying the law outlined above to the facts in this case, I need to take note of

13

portions of the Indiana Criminal Code. First, pointing a firearm at another person is a felony level offense in the State of Indiana. Ind. Code § 35-47-3-4 (pointing firearm at another person is a class 6 felony).[9]

Second, under Indiana law, a person who recklessly, knowingly, or intentionally performs an act that creates a substantial risk of bodily injury to another person commits criminal recklessness, a misdemeanor level offense. Ind. Code § 35-47-3-4(a) (criminal recklessness is a class B misdemeanor). However, the offense of criminal recklessness is a Level 6 felony if it is committed while armed with a deadly weapon. Ind. Code § 35-47-3-4(b). Under Indiana law, waving[10] a firearm can support a conviction for pointing a firearm and/or criminal recklessness. *See Brown v. State,* 790 N.E.2d 1061, 1066 (Ind. Ct. App. 2003).[11] A conviction of criminal recklessness based on waving a firearm may also serve as the basis of a sentence enhancement. *See United States v. Perry,* 223 F.3d 431, 432 (7th Cir. 2000) (government requested a four-level sentence enhancement for possession of a gun in connection with felony criminal recklessness based on Perry's conduct in waving the gun at the other man during their argument).

Finally, making a false report of the commission of a crime is a misdemeanor level offense in the State of Indiana. Ind. Code § 35-47-3-4 (false reporting is a class B misdemeanor, but may be aggravated to a class A misdemeanor if it substantially hinders any law enforcement process or results in harm to another person).

---

[9] Defendant's Motion to Suppress makes note of the same statute. [DE 22 at 5 n.3].
[10] "Wave" is defined as "[t]o cause to move back and forth or up and down, either once or repeatedly." Amer. Heritage College Dictionary, p. 1550 (4th ed. 2004).
[11] In *Brown,* the Indiana Court of Appeals upheld a defendant's convictions for pointing a firearm when he was alleged to have waved it at the three occupants of a vehicle based on the rationale that the purpose of the statute was "'to protect individuals from being placed in danger of death or bodily injury from the discharge of a firearm.'" *Brown,* 790 N.E.2d at 1066 (quoting *Armstrong v. State,* 742 N.E.2d 972, 976 (Ind. Ct. App. 2001)). In *Armstrong,* the Indiana Court of Appeals opined that under certain circumstances, a defendant may be charged with and convicted of multiple counts of pointing a firearm arising out of a single incident during which the defendant engages in one continuous action of pointing a firearm, such as when a defendant waves a gun indiscriminately toward a crowd of people. *Armstrong,* 742 N.E.2d at 977 n.2.

The question before the Court is did the information provided by the anonymous tipster to the Michigan City Police Department have a sufficient "indicia of reliability" to provide Detective Corley with reasonable suspicion to stop the black Suburban driven by the Jeanes? For the reasons that will be outlined below, I conclude that the tip had sufficient indicia of reliability consistent with the legal standard established by *White, J.L,* and *Navarette,* and that Detective Corley had reasonable suspicion to believe that the occupants of the black Suburban were engaging or had engaged in criminal activity.

First, like in *Navarette,* the unknown caller here claimed eyewitness knowledge of the dangerous activity. *See* 134 S.Ct. at 1689. The 911 operator asked the caller, "What is the address of your emergency?" (Gov. Hrg. Ex. 1). The caller responded by saying, "There's no address, there's a man in black [unintelligible] waving a gun . . . it's a black Suburban." Id. The caller's explicit and detailed account—the "play-by-play" account of her personal, firsthand observations—entitled the police to give greater weight to the reliability of this anonymous tipster. *See Navarette,* 134 S.Ct. at 1689. The unknown informant provided a specific, continuing, and contemporaneous narrative of both the illegal activity (waving a gun) and the location of the subject vehicle. (Gov. Hrg. Ex. 1). This firsthand, eyewitness description justified an immediate and emergent response by the police department. *See Navarette,* 134 S.Ct. at 1689.

Second, the responding officer was able to quickly corroborate the information provided by the unknown tipster. In approximately three minutes, Detective Corley was able to confirm the location of the black Suburban. As indicated by the caller, the Suburban was being driven by a black male and was located within three blocks of the caller's the initial report of the Suburban's location on 9th Street in Michigan City. In addition, based on the amount of time

elapsed and the prompt corroboration of the basic elements of the tip, the reliability of the eyewitness report substantially overcame any risk of fabrication.

Furthermore, in *Navarette,* the timeline suggested that the caller was reporting the event soon after it occurred, *id.;* whereas, here the eyewitness caller was contemporaneously reporting the event to police dispatch. (Gov. Hrg. Ex. 1). Under either a theory of an excited utterance or of a present sense impression, the statements of the unknown eyewitness were entitled to trustworthiness. *See Navarette,* 134 S.Ct. at 1689. The contemporaneous and detailed reporting by the caller supported the police officer's reliance on the report in arriving at a reasonable suspicion about the occupants of the black Suburban. *See id.*

An additional indicia of reliability is the caller's use of the 911 system to declare an emergency. A 911 call center has "some features that allow for identifying and tracing callers, and thus provide some safeguards against making a false report." *Id.* Obviously, like the call in *Navarette,* the call on April 18th to the Michigan City dispatch center was recorded. (Gov. Hrg. Ex. 1). Based on the recording, a victim of a false report would have the opportunity to identify a false tipster and subject her to prosecution for false reporting under Indiana law. *See* Ind. Code § 35-47-3-4. "[A] reasonable police officer could conclude that a false tipster would think twice before using [the 911] system." *Navarette,* 134 S.Ct. at 1690. Likewise, here, the caller remained on the 911 call for an extended period of time and provided her contemporaneous observations. (Gov. Hrg. Ex. 1). It is reasonable to conclude that the unknown tipster was well aware that the call was being recorded and was cognizant of the risks associated with false reporting.[12]

Furthermore, it is readily apparent from the particular facts of this case that the police

---

[12] Here, the unknown tipster also identified the type of vehicle that she was driving—a grey Trans Am. (Gov. Hrg. Ex. 1). Police in the vicinity could have located the caller's vehicle by its description and the caller could have been identified. When she provided the description of her vehicle, it is fair to infer that the caller was aware that her identify could have been established by the police in the immediate vicinity.

16

reasonably relied on the veracity of the unknown 911 caller.[13] Several cases have given a 911 emergency call a greater degree of reliability than an anonymous tip. *United States v. Terry-Crespo,* 356 F.3d 1170, 1176 (9th Cir. 2004) ("The Fourth Amendment does not require the police to conduct further pre-response verification of a 911 caller's identify where the caller reports an emergency"); *Anthony v. City of New York,* 339 F.3d 129, 136–37 (2d Cir. 2003) (anonymous 911 call placed from verifiable address justified warrantless entry based on emergent circumstances where the caller "expressed an immediate risk of harm to herself"); *United States v. Holloway,* 290 F.3d 1331, 1338–39 (11th Cir. 2002) ("[W]hen an emergency is reported by an anonymous caller, the need for immediate action may outweigh the need to verify the reliability of the caller"); *United States v. Watson,* No. 2:15-CR-79, 2016 WL 4578152 (N.D. Ind. Sept. 2, 2016) (anonymous 911 call found to sufficiently reliable because caller claimed eyewitness knowledge of gun activity, made the call contemporaneous with events, and indicated a willingness to assist police). Likewise here, the police were responding to an emergency situation that a gun was being waved from inside a vehicle, and the police did not need to confirm the identity of the unidentified caller prior to responding to that emergency.

Another factor that supports the veracity of the unknown caller is her demeanor during the 911 call. (Gov. Hrg. Ex. 1). One of the advantages of having a 911 recording is that it allows a court to independently assess the credibility of the caller in the context of reasonable reliance by the police. In listening to this 911 call, it was obvious that the caller was excited about a

---

[13] The circumstances in this case demonstrate the prescience of Justice Kennedy's concurrence in *J.L.*: "[A] tip might be anonymous in some sense yet have certain other features, either supporting reliability or narrowing the likely class of informants, so that the tip does provide the lawful basis for some police action . . . . An instance where a tip might be considered anonymous but nevertheless sufficiently reliable to justify a proportionate police response may be when an unnamed person driving a car the police officer later describes stops for a moment and, face to face, informs the police that criminal activity is occurring." *J.L.,* 529 U.S. at 275–76. Here, the informant was not providing the information to the police "face to face," but was utilizing the technological equivalent—the 911 emergency center. And, like a face to face report, this emergency report had significant indicia of reliability.

17

frightening event—she was speaking rapidly and even articulated that she was scared by what had happened. Id. This level of excitement in the voice of the eyewitness caller supports a determination that the police reasonably relied on her exited utterances and present sense impressions in determining that there was reasonable suspicion to stop the black Suburban located near 10th and Pine Streets. (Hrg. Tr., p. 10, ln. 8–10).

Finally, as noted above, the tip established reasonable suspicion that "criminal activity may be afoot." See *Navarette,* 134 S.Ct. at 1690 (quoting *Terry,* 392 U.S. at 30.). Under a theory that the conduct of the vehicle occupants violated Indiana's prohibition against either pointing a firearm or criminal recklessness, or *both*, the police had reasonable suspicion to believe that the occupants of the black Suburban had engaged or were engaging in criminal activity.

Applying a commonsense approach to the facts here, the stop was justified by an objective manifestation that the occupants of the vehicle had engaged or were engaging in a violation of Indiana law. The report from the caller stated that one of the occupants was waving a gun and that she was scared. The police could reasonably conclude that the occupants of the black Suburban had pointed the weapon at a person while waving it out of the vehicle or had engaged in criminal reckless by pointing a firearm out of the vehicle. Either way, this dangerous behavior justified an emergent response to protect the public and justified a traffic stop based upon reasonable suspicion of a violation of Indiana law. As these circumstances, in combination, established sufficient reasonable suspicion to justify a continued inquiry and investigation, the stop of the black Suburban was proper.

While not fully briefed by the parties, at the October 20 hearing, Jeanes suggested that Detective Corley should have known that Jeanes was not a viable suspect for the offense of waving a gun because Corley knew Jeanes for many years and knew that Jeanes was missing the upper

part of his left arm. (Hrg. Tr., p. 25, ln. 2–8). As such, the defense contends, whatever reasonable suspicion that Detective Corley had to effectuate a *Terry* stop was dispelled by Jeanes' disability. Id. While the defense's argument has a certain simple elegance, it ignores one essential fact—Jeanes was not the only person inside the vehicle. Duane Simmons was a passenger in the black Suburban, and it was reasonable for police to inquire about the report from both occupants. Under these facts, Detective Corley continued to have reasonable suspicion following the stop even though the driver—Jeanes—did not have a left hand.[14]

Finally, as noted previously, a *Terry* stop must be reasonable in scope and time. *See, e.g.*, *Finke,* 85 F.3d at 1279 (quoting *Terry*, 392 U.S. at 19). Here, the search was well within the scope and time for a reasonable stop. Having reasonable suspicion to stop the black Suburban driven by Jeanes, the police were merely making reasonable inquiry by asking for consent to search the vehicle. Jeanes consented to the search, and at the time he consented to the search, Detective Corley had not concluded his investigation related to the report of gun being waved from a black Suburban, which was the "mission" of the stop. Moreover, this was the reason for the stop that was articulated by Detective Corley to Jeanes. (Hrg. Tr., p. 12, ln. 22–24). There is simply no evidence in the record to reflect that Jeanes' consent to search the vehicle was anything but voluntary. Even before the police could begin the actual search, Jeanes admitted that he had a gun under the seat. The entire episode—from report, to stop, to consent, to admission—lasted only a few minutes.

There is nothing to suggest that the stop or the search was improper. As such, the motion

---

[14] Even if Jeanes had been the only occupant, the police may have had reasonable suspicion to make further inquiry following the stop irrespective of Jeanes' disability. To articulate what may be obvious, the lack of a left arm would not prevent Jeanes from waving a gun with his right hand. It is possible that Jeanes could steer a vehicle with his left arm or with his knee thereby freeing his right hand. As such, the fact that a driver does not have a left hand would not necessarily dispel the reasonable suspicion regarding a report of person waving a gun from inside a vehicle.

to suppress should be denied.

## IV.  Conclusion

For the reasons stated herein, I **RECOMMEND** defendant's Motion to Suppress [DE 22] be **DENIED**.\*

Dated: November 29, 2016.

                                                      s/Michael G. Gotsch, Sr.
                                                     Michael G. Gotsch, Sr.
                                                     United States Magistrate Judge

---

\* Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b)(2) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 150 (1985); *United States v. Hall,* 462 F.3d 684, 689 (7th Cir. 2006) ("When a right is waived, it is not reviewable, even for plain error"). Only specific objections are reserved for appellate review. *Lockert v. Faulkner*, 843 F.2d 1015, 1018 (7th Cir. 1988); *United States v. Harris,* 470 F. App'x 504, 506 (7th Cir. 2012).